## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MARATHON PETROLEUM COMPANY LP,

          Plaintiff,

  v.

3M COMPANY (f/k/a MINNESOTA
MINING AND MANUFACTURING CO.);
NATIONAL FOAM, INC.; TYCO FIRE
PRODUCTS LP; CHEMGUARD, INC.;
HAYDEN & COMPANY; WILLFIRE LLC;
and DOE DEFENDANTS 1 TO 20,

          Defendants.

Case No. 2:22-cv-10117

**NOTICE OF REMOVAL**

Defendants Tyco Fire Products LP and Chemguard, Inc. (collectively "Tyco" unless identified by full name), by and through undersigned counsel, hereby give notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the Circuit Court for the County of Wayne, to the United States District Court for the Eastern District of Michigan.  As grounds for removal, Tyco alleges as follows on personal knowledge as to its own conduct and status and on information and belief as to all other matters:

## PRELIMINARY STATEMENT

1.     Plaintiff Marathon Petroleum Company LP seeks to hold Tyco and other Defendants liable based on their alleged conduct in designing, manufacturing, selling, or distributing aqueous film-forming foam ("AFFF") containing so-called "Long-Chain" per- and polyfluoroalkyl substances ("PFAS"), including perfluoro-octanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS").   Plaintiff claims that its use of AFFF at its Detroit Refinery (the "Property") to extinguish fires and to train firefighting personnel has contaminated and damaged its property and caused it to incur certain costs.   One widely used type of AFFF has been manufactured by a select group of suppliers (including Tyco) under the authority and direction of the Department of Defense ("DoD") and in accordance with the military's rigorous specifications ("MilSpec AFFF").   Although the Complaint states that Plaintiff does not claim that the Property itself has been contaminated by MilSpec AFFF, *see* Complaint (Ex. A) ¶ 56, it seeks compensatory damages for, among other things, alleged "real property environmental stigma/loss of market value." *Id.* ¶ 120.  Tyco denies that Plaintiff is entitled to any recovery, including recovery of damages for alleged "real property environmental stigma/loss of market value."  But at least to the extent that Plaintiff intends to seek discovery and damages for "real property environmental stigma/loss of market value," Tyco intends to raise the *defense* that such damages arise at least in part from the presence of PFAS from

MilSpec AFFF in the vicinity of (if not on) the Property. *See Nessel v. Chemguard, Inc.*, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) ("Plaintiffs cannot decide what defense Defendants might present"). Insofar as Plaintiff's damages claim relates to MilSpec AFFF, Tyco's conduct is immune from liability (and damages) under the federal "government contractor" defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). Because, with respect to MilSpec AFFF, Tyco has acted under federal authority and has a federal defense, the federal officer removal statute, 28 U.S.C. § 1442(a)(1), entitles Tyco to remove this action in order to have that defense adjudicated in a federal forum. *See, e.g., Bennett v. MIS Corp.*, 607 F.3d 1076, 1084-85 (6th Cir. 2010); *accord Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016). Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

2.      All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's claimed injuries or damages are caused at least in part by MilSpec AFFF. *See, e.g.*, *Chemguard*, 2021 WL 744683, at *3; *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018). The court overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation has also found on

3

multiple occasions that removal under § 1442(a)(1) is proper in these circumstances. *See* Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 103 (D.S.C. May 24, 2019) ("MDL Order 1"), at 3–6; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3"), at 3–6. Given its experience with the claims and defenses in AFFF litigation, the MDL Court's holdings clearly demonstrate that this case, too, has been properly removed to federal court.[1]

## BACKGROUND

3.     This action was filed on December 16, 2021, in the Circuit Court for the County of Wayne bearing Case No. 21-017284-CB (Ex. A, Complaint). Venue is proper in this Court pursuant to 28 U.S.C. §§ 102(a) and 1441(a) because the Circuit Court for the County of Wayne is located within the Eastern District of Michigan.

4.     Tyco Fire Products LP and Chemguard, Inc. were both served on December 20, 2021. This Notice of Removal is timely filed in accordance with 28 U.S.C. § 1446(b).

---

[1] Following removal, Tyco intends to designate this action for transfer to the MDL.

4

5.     Tyco is not required to notify or obtain the consent of any other Defendant in this action in order to remove Plaintiff's action as a whole under § 1442(a)(1).  *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Hilbert v. McDonnell Douglas Corp.,* 529 F. Supp. 2d 187, 195 (D. Mass. 2008); *Linden v. Chase Manhattan Corp.*, No. 99 Civ. 3970(LLS), 1999 WL 518836, at *1 (S.D.N.Y. July 21, 1999).

6.     Plaintiff alleges generally that the Defendants, including Tyco, have designed, manufactured, marketed, distributed, and/or sold AFFF products that contain Long-Chain PFAS, including PFOS, PFOA, and/or their chemical precursors.   Plaintiff alleges that the AFFF designed, manufactured, marketed, distributed, and/or sold by the Defendants, has caused PFAS contamination of the Property and has caused or will cause Plaintiff to incur various costs.  Complaint ¶ 10.  Plaintiff also seeks damages for "real property environmental stigma//loss of market value."  *Id.* ¶ 120.

7.     Plaintiff asserts causes of action against all Defendants for silent fraud (*id.* ¶¶ 121–26), innocent misrepresentation (*id.* ¶¶ 127–31), nuisance – common law/MCL 324.3109 (*id.* ¶¶ 132–36), failure to warn/MCL 600.2948(3) (*id.* ¶¶ 137–46), product design defect (*id.* ¶¶ 147–54), negligence (*id.* ¶¶ 155–59), NREPA part 201 cost recovery (*id.* ¶¶ 160–72), NREPA part 201 contribution (*id.* ¶¶ 173–81), unjust enrichment (*id.* ¶¶ 182–85), and declaratory judgment (*id.* ¶¶ 186–89).

5

8.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for all parties and a copy is being filed with the Clerk of the Circuit Court for the County of Wayne.

9.     By filing a Notice of Removal in this matter, Tyco does not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person, or venue; and Tyco specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

10.    Tyco reserves the right to amend or supplement this Notice of Removal.

## <u>REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442</u>

11.    Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer.  Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" that has "acted under" federal authority; (b) its actions taken pursuant to a federal officer's direction have a causal nexus with plaintiff's claims or injuries or are otherwise related to the lawsuit; and (c) it can assert a "colorable" federal defense.  *Bennett*, 607 F.3d at 1085-88; 28 U.S.C. § 1442.

12.    Removal rights under Section 1442(a)(1) have a "broad scope," *Bennett*, 607 F.3d at 1084—much broader than under the general removal statute,

28 U.S.C. § 1441.  Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).  This is because Section1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *see Durham*, 445 F.3d at 1252.  To the contrary, Section 1442 as a whole must be "liberally construe[d]" in favor of removal.  *Papp*, 842 F.3d at 812 (alterations in original) (internal quotation marks omitted).

## A.    MilSpec AFFF

13.    Since the 1960s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property.  Indeed, the United States Naval Research Laboratory developed AFFF in response to catastrophic fires aboard the aircraft carriers *USS Forrestal* in 1967 and *USS Enterprise* in 1969.[2]  Decades later, the Naval Research Laboratory described

---

[2] *See* Press Release 71-09r, U.S. Naval Research Lab., Navy Researchers

the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[3]

14.     The manufacture and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command. The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[4]  All MilSpec AFFF products must be qualified for listing on the applicable Qualified Products List prior to military procurement.  Prior to such listing, a manufacturer's products are examined, tested, and approved to be in conformance with specification requirements.[5]  The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.  After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity

---

Apply Science to Fire Fighting (Oct. 23, 2009), https://tinyurl.com/y2jq4q4w.

[3] U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[4] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[5] Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

of the qualification status."[6]   Naval Sea Systems Command reserves the right to perform any of the quality assurance inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements.

15.     From its inception until very recently, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants."   All fluorocarbon surfactants are PFAS, and that category includes the Long-Chain compounds PFOA, PFOS, and their chemical precursors—the very compounds at issue in the Complaint here.  This requirement has been in force for virtually the entire time period at issue in the Complaint.  In 2019 the MilSpec removed the modifier "fluorocarbon" from "surfactants," but it expressly states that "the DoD intends to acquire and use AFFF with the lowest demonstrable concentrations of . . . PFOS and PFOA" "[i]n the short term."  PFOA or PFOS are unavoidably present at some concentrations in fluorocarbon surfactants, and the current MilSpec expressly contemplates that AFFF formulations will contain PFOA and PFOS (subject to recently imposed limits).

16.     Part 139 airports are those serving scheduled passenger flights by nine passenger (or larger) aircraft or unscheduled passenger flights by 31 passenger (or larger) aircraft.  *See* 14 C.F.R. § 139.1 (2019).  The federal government requires Part

---

[6] *Id.*

139 airports to use MilSpec AFFF.  On July 8, 2004, the FAA issued Advisory Circular 150/5210-6D, which stated that "AFFF agents [used by Part 139 airports] must meet the requirements of Mil-F-24385F."[7]  Although the preamble indicated that the circular was for guidance only, on February 8, 2006, the FAA issued a CertAlert clarifying that the MilSpec AFFF requirement was, in fact, mandatory and that "[a]ny AFFF purchased after July 1, 2006 by an airport operator certified under Part 139 must meet [Mil-F-24385F]."[8]  The FAA explained:

> There are several reasons for this requirement.  First of all, AFFF has to be compatible when mixed.  AFFF manufactured by different manufacturers, although meeting the UL 162 standard, may not be compatible.  AFFF meeting the Military Specification will always be compatible with other Military Specification AFFF no matter the manufacturer.  Second, AFFF meeting the military specification requires less agent than AFFF meeting UL 162 to extinguish the same size fire.  Finally, the requirement to use Mil Spec is in concert with the National Fire Protection Association National Fire Code 403, paragraph 5.1.2.1.[9]

17.    On September 1, 2016, the FAA issued a superseding CertAlert, which reiterated that "Airport operators must ensure any AFFF purchased after July 1, 2006, meets Mil-Spec standards."[10]  Thus, from July 1, 2006 to present, airport

---

[7]    *See* Advisory Circular 150/5210-6D at 4, Chapter 6, https://tinyurl.com/yxpk87ky.

[8] *See* DOT/FAA/TC-14/22, Impact of Alternative Fuels Present in Airports on Aircraft Rescue and Firefighting Response at 25-26 (Aug. 2014), https://tinyurl.com/rt35dgp.

[9] *Id.*

[10] Federal Aviation Administration, Cert Alert No. 16-05: Update on Mil-Spec

operators holding an FAA Airport Operating Certificate have been required to purchase MilSpec AFFF for use.

**B.      MilSpec AFFF Impacts in the Vicinity of Plaintiff's Property**

18.     As noted above, Plaintiff here seeks "compensatory and exemplary damages consisting of general and site-specific costs and damages incurred and to be incurred by Marathon including … real property environmental stigma/loss of market value damages."  Complaint ¶ 120.

19.     Plaintiff's Property is proximate to two waterways—the Rouge River and the Detroit River—that are likely to contain PFAS from MilSpec AFFF.

20.     The Willow Run Airport (the "Airport"), located southwest of the Property, is a Part 139 airport.  Since at least 2006, the Airport has used and released MilSpec AFFF (some of which, on information and belief, Tyco has manufactured) to fight fires and/or for training purposes.  PFAS have been detected in the soil and groundwater at the Airport, Airport, and they have also been detected in an adjacent surface water body downstream of the airport that drains to the Rouge River.  Water flows from the area of the Airport to the Rouge River and ultimately into the Detroit River.  Some PFAS in the Rouge River and the Detroit River likely originates from

---

Aqueous    Film    Forming    Foam    (AFFF)    at    2    (Sept.    1,    2016), https://tinyurl.com/ya5pvbkh.

MilSpec AFFF used at the Airport.  Plaintiff's Property lies within several hundred yards of the Rouge River and within less than three miles of the Detroit River.

21.   The Selfridge Air National Guard Base (the "Base"), located northeast of the Property, has been identified by the State of Michigan in other litigation as a site that has been contaminated by PFAS from MilSpec AFFF.  The Base has used and released MilSpec AFFF (some of which, on information and belief, Tyco has manufactured) to fight fires and/or for training purposes.  In addition, in 2018 approximately 800 gallons of MilSpec AFFF were spilled at the Base in 2018.  As a result of these activities, substantial levels of PFAS have been detected at the Base. Surface water runoff and groundwater from the Base flows into Lake St. Clair, which in turn flows into the Detroit River.  Based on available data, it is reasonable to infer that some of the PFAS detected in the Detroit River originated from MilSpec AFFF used at the Base.

22.   Again, Tyco denies that Plaintiff is entitled to any recovery, including recovery of damages for alleged "real property environmental stigma/loss of market value."  But, in the alternative, Tyco contends that if Plaintiff has suffered any such "real property environmental stigma/loss of market value damages," they have been caused at least in part by the proximity of the Property to the locations described above where PFAS from MilSpec AFFF are present.

C.    **All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied**

        *1.    Tyco Is a "Person" that Has "Acted Under" Federal Authority in Designing and Selling MilSpec AFFF.*

    23.    Tyco Fire Products LP and Chemguard, Inc. (a limited partnership and corporation, respectively) each meet the definition of a "person" under Section 1442(a)(1).  For purposes of the statute, the term "person" includes "corporations, companies, associations, firms, [and] partnerships."  *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *accord Bennett*, 607 F.3d at 1085; *Isaacson*, 517 F.3d at 135–36.

    24.    "The words 'acting under' are to be interpreted broadly . . . ."  *Isaacson*, 517 F.3d at 136 (citation omitted).  The requirement that a defendant "act[] under" a federal officer is satisfied when an entity assists or helps carry out, the duties or tasks of a federal officer.  *Papp*, 842 F.3d at 812; *accord Bennett*, 607 F.3d at 1088. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained of conduct was done at the specific behest of the federal officer or agency."  *Papp*, 842 F.3d at 813.  A government contractor that manufactures a product to government specifications "act[s] under" federal authority.  *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153 (2007).

    25.    The requirement of "acting under" federal office is met here because the effect of Plaintiff's claims, at least in part, is to challenge Tyco's alleged conduct in providing vital products "that, in the absence of Defendants, the Government would have had to produce itself."  *Isaacson*, 517 F.3d at 137.  MilSpec AFFF is a

mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[11] Accordingly, the military has long depended upon outside contractors like Tyco to develop and supply AFFF. *See Chemguard*, 2021 WL 744683, at *3 (holding that Tyco and other AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *see also* MDL Order 1, at 3–6 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL Order 2, at 3–5; MDL Order 3, at 3–6 (same). If Tyco and other manufacturers did not provide MilSpec AFFF, the government would have to manufacture and supply the product itself.

---

[11] Fulfilling the Roosevelts' Vision, *supra* n.3, at 37.

14

26.     In designing, manufacturing and supplying the MilSpec AFFF at issue, Tyco acted under the direction and control of one or more federal officers. Specifically, Tyco acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.  Further, the AFFF products in question were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[12]

### 2.     *The Nexus Requirement Is Satisfied.*

27.     The second requirement, that the defendant's actions taken "under color of federal office" have a causal nexus with plaintiff's claims or injuries or be otherwise related to the lawsuit, erects a hurdle that "is quite low."   *Isaacson*, 517 F.3d at 137; *accord Bennett*, 607 F.3d at 1088.[13]  To satisfy this requirement, it is sufficient for a defendant to establish that an act that allegedly caused or contributed to the plaintiff's injury occurred while the defendant was performing its official duties.  *Isaacson*, 517 F.3d at 137–38.

---

[12] *See* Dep't of Defense, SD-6, *supra* n.5, at 1.

[13] The "acting under" and "under color of" prongs overlap.  Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction."  *Albrecht*, 2011 WL 5109532, at *5.

28.    In assessing removal under Section 1442(a)(1), courts "credit Defendants' theory of the case when determining whether [the] causal connection exists." *Isaacson*, 517 F.3d at 137; *see also Chemguard*, 2021 WL 744683, at *3. Here, accepting Tyco's allegations as true, Plaintiff's claimed "real property environmental stigma/loss of market value damages" arise at least in part from Tyco's production and sale of AFFF manufactured to military specifications and used at the Airport and the Base.  Plaintiff alleges that Long-Chain PFAS in AFFF are the source of its damages.  Tyco contends that the presence of such chemicals in MilSpec AFFF was required by military specifications and/or otherwise approved by DoD.  The conflict is apparent: MilSpec AFFF was developed by Tyco, and other manufacturers to meet specifications established by the DoD.  The design choices Plaintiff is attempting to impose via state tort law would create a conflict in which Tyco could not comply with both the MilSpec and the purported state-prescribed duty of care.  *See Boyle*, 487 U.S. at 509; *see also Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); MDL Order 1, at 5–6 ("Here, [Plaintiff]'s claims arise out of use of AFFF products that it claims Tyco manufactured and sold, and for which the U.S. military imposes MilSpec standards. The Court . . . finds that the causation element of federal officer removal is satisfied here."); MDL Order 2, at 5 (finding the causation element of federal officer removal

satisfied where Tyco's AFFF products, "for which the military imposes MilSpec standards," were used at several airports); MDL Order 3, at 5–6 (same as to MilSpec AFFF used at a single airport).  Because Plaintiff's purported stigma damages arise at least in part from MilSpec AFFF, the nexus between Plaintiff's alleged "real property environmental stigma/loss of market value damages" and Tyco's actions under color of federal office is clear.

### 3.  *The "Colorable Federal Defense" Requirement Is Satisfied.*

29.    The third requirement ("colorable federal defense") is satisfied by Tyco's assertion of the government contractor defense.

30.    At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'"  *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted); *accord Bennett*, 607 F.3d at 1089 ("a colorable federal defense need only be plausible").  In other words, "[a] defendant 'need not win his case before he can have it removed.'"  *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." (citation omitted)).  At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-

17

discovery, to determine the threshold jurisdictional issue." *Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014).[14]   Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010).  "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

31.    Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

32.    Tyco has satisfied these elements for purposes of removal.   As discussed above, Naval Sea Systems Command approved reasonably precise specifications, governing MilSpec AFFF formulation, performance, testing, storage,

---

[14] *See also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage.  Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (internal citation omitted)).

inspection, packaging, and labeling.  Tyco's products appeared on the DoD Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec.  *See Ayo*, 2018 WL 4781145, at *13 ("[T]here is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use [PFAS], including PFOS and PFOA, in their products."); *see also id.* ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); MDL Order 1, at 5 (finding defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications"); MDL Order 2, at 4 (same, as to Tyco); MDL Order 3, at 5 (same); *see also Chemguard*, 2021 WL 744683, at *4.

33.    Moreover, the government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF.  The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand.  Indeed, it is clear that the United States has long understood that AFFF contains Long-Chain PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially

reach groundwater; and that it has been reported that this may raise environmental or human health issues.[15]  For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from fire fighting exercises are considered to have adverse effects environmentally."[16]  By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."   In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer. More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA.  Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[17]

---

[15] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1–6 (Nov. 4, 2002).

[16] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[17] Dep't of Defense, *Aqueous Film Forming Foam Report to Congress* 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants," and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[18]  *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); MDL Order 1, at 5 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . .").

34.    At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks.  *See Twinam v. Dow Chem. Co.* (*In re "Agent Orange" Prod. Liab. Litig.*), 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A

---

[18] *See* MIL-PRF-24385F(SH), Amendment 4, § 6.6 & Tables I, III (2020), https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=17270; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)).  Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies.  *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

35.  By seeking to impose tort liability on Tyco for alleged injuries to Plaintiff that were caused in whole or in part by Tyco's compliance with military specifications, Plaintiff is attempting to use state tort law to attack design choices dictated by the military.  The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

WHEREFORE, Tyco hereby removes this action from the Circuit Court for the County of Wayne to this Court.

Dated:  January 19, 2022        Respectfully submitted,

*/s/ Nicholas J. Ellis*
Ann Marie Uetz (P48922)
Nicholas J. Ellis (P73174)
FOLEY & LARDNER LLP
500 Woodward Ave., Suite 2700
Detroit, MI 48226
(313) 234-7100
auetz@foley.com
nellis@foley.com

*Attorneys for Tyco Fire Products, LP,*
*Chemguard, Inc., and Willfire HC LLC,*
*d/b/a Williams Fire and Hazard Control,*
*Inc.*

## **CERTIFICATE OF SERVICE**

I, Nicholas J. Ellis, hereby certify that this document filed through the ECF system will be sent electronically all registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on this date including plaintiffs.


Dated: January 19, 2022                          */s/ Nicholas J. Ellis*